

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-84,073-01

**EX PARTE MARTIN PENA, Applicant**

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### IN CAUSE NO. 1379020-A IN THE 184TH DISTRICT COURT
### HARRIS COUNTY

HERVEY, J., announced the judgment of the Court and delivered an opinion in which KELLER, P.J., and KEASLER, J., joined. NEWELL, J., filed a concurring opinion. RICHARDSON, J., filed a dissenting opinion in which ALCALA and WALKER, JJ., joined. YEARY, J., filed a dissenting opinion. WALKER, J., filed a dissenting opinion in which ALCALA and RICHARDSON, JJ., joined. KEEL, J., concurred.

### O P I N I O N

Applicant, Martin Pena, pled guilty to intentionally possessing at least 400 grams of cocaine with intent to deliver. He was sentenced to the statutory minimum of 15 years' confinement and assessed a $1,000 fine. He did not appeal. After his conviction, it was discovered that one of the arresting officers had been participating in a drug "swapping" conspiracy that may have affected Pena's case. He now claims in his writ application that

his conviction is based on fabricated evidence and that the State violated its duty under *Brady* to disclose the misconduct before he pled guilty. He also argues that his guilty plea is involuntary because, had he known, he would have insisted on going to trial. We will deny relief.

## BACKGROUND

On or about February 27, 2013, Officer Marcos Carrion and Officer D. Stewart initiated a traffic stop when Pena failed to signal a lane change. As Pena's vehicle came to a stop, one of the officers noted that it did not have brake lights. Once police made contact, one officer smelled the odor of alcohol on Pena's person and observed that he appeared nervous. Upon request, Pena produced his driver's license but was unable to provide proof of insurance. The police ran a warrant check and discovered Pena had an active warrant from the City of Houston. Pena was arrested, and because he was the sole occupant of the vehicle, an inventory search was performed and the car was impounded. During the search, police discovered a large Rubbermaid ice chest in the backseat containing about 26 kilograms of a substance that field-tested positive for cocaine. The analysis of the Houston Police Department Crime Laboratory confirmed that the substance contained cocaine. (Pena does not dispute this.) Carrion and Stewart called narcotics officers to the scene who took custody of the drugs. On October 10, 2013, Pena pled guilty to possession of at least 400 grams of cocaine with intent to deliver. He was sentenced to the statutory minimum of 15 years and fined $1,000.

Pena was interviewed at the central jail facility, and he gave a statement to police. According to that statement, a friend asked for a favor and said that he would pay Pena $500. Pena agreed because he needed money for rent. He was instructed to meet his friend Manny at a local taqueria. Manny and two other men met Pena, and one of the men took Pena's vehicle. When the man returned with the car, there was a black ice chest sitting in the backseat. Pena was told to take the car to a mall, to leave the keys in the car, and to walk away.

Unbeknownst to the State, federal authorities had received information from a confidential informant that Carrion was "dirty." They discovered that Carrion was working for narcotic traffickers and using his position as a police officer to provide them with information, protection, and security.[1] However, authorities also learned that Carrion's misconduct was not limited to working with them. He also used his inside information to steal from the traffickers he worked for. When a shipment was identified, Carrion and his cohorts replaced the trafficker's cocaine with sheetrock and trace amounts of cocaine sprinkled on top. Carrion would then seize the "fake" drugs once they reached their destination (usually a courier), knowing that the replaced sheetrock with the sprinkling of cocaine would field-test positive and that it would not be tested for purity. By doing this, Carrion was able to steal narcotics from the traffickers he was working for, and because the traffickers believed that their drugs were in the possession of the State,

---

[1]For example, in June 2013, Carrion was paid $5,000 to provide "protection" for an illegal drug deal.

they never learned that the drugs had been stolen.

In February 2014, Carrion eventually confessed to several acts of criminal activity, including public corruption, drug conspiracy, and theft. In April of that year, Carrion was federally indicted for conspiracy to possess with the intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine. He was convicted that October. A month later, the DEA tested the drugs seized from Pena and discovered that they contained only trace amounts of cocaine.

On December 22, 2014, about fourteen months after Pena pled guilty, the Harris County District Attorney's Office learned of Carrion's misconduct. The office notified the judge of the 184th District Court, in which Pena was convicted, who appointed the Harris County Public Defender's Office to represent Pena. In March 2015, the Harris County District Attorney's Office tendered a formal *Brady* notice. This post-conviction writ application followed.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The habeas court adopted, with handwritten changes, Pena's proposed findings of fact and conclusions of law. The court found that Carrion conspired to tamper with evidence in Pena's case and to place that fabricated evidence[2] in Pena's vehicle. It further found that Carrion was essential to Pena's conviction and that Carrion's participation in a conspiracy to tamper with and fabricate evidence as well as his federal conviction render

---

[2]According to the habeas court, the DEA "confirmed that the evidence in [Pena]'s case was an elaborate fake."

him a non-credible witness.

The habeas court recommends that we grant relief because the State violated *Brady* by failing to disclose Carrion's misconduct to Pena before he entered his guilty plea. As a result of that violation, the court further found that Pena's plea was involuntary because, had he known about Carrion's misconduct, he would have insisted on going to trial.

## FILED AND SET

We filed and set Pena's post-conviction writ application and ordered briefing from the parties on the following issues:

(1) Whether the misconduct in Pena's case should be imputed to the prosecution for purposes of Pena's *Brady* claim;

(2) Whether the misconduct in Pena's case is favorable to him; and

(3) Whether Pena's plea was involuntary because of "impermissible conduct by state agents."

## STANDARD OF REVIEW

In post-conviction writ proceedings, the convicting court is the original factfinder, and this Court is the ultimate factfinder. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). We generally defer to and accept the findings and conclusions of the convicting court when they are reasonably supported by the record. *Id.* However, if our own independent review of the record shows that the findings or conclusions are not reasonably supported by the record, this Court can exercise its authority to make contrary or alternative findings and conclusions. *Id.*

## IS THE EVIDENCE FAVORABLE?

One of the issues the parties were asked to brief is whether the evidence of Carrion's misconduct is favorable to Pena for purposes of his *Brady* claim. Pena claims that it is. According to him, the disclosure that Carrion fabricated evidence in his case renders that evidence (the drugs seized from Pena's car) inadmissible under the Fourth Amendment and state law.[3] According to him, the fabricated evidence was subject to suppression under the Texas exclusionary rule because we have held that a violation of the "tampering with or fabricating physical evidence" statute "bars the admission of other evidence obtained through that violation." *Wilson v. State*, 311 S.W.3d 452, 464 (Tex. Crim. App. 2010); *see* TEX. PENAL CODE § 37.09 (statute criminalizing tampering with or fabrication of physical evidence); TEX. CODE CRIM. PROC. art. 38.23 (state suppression rule). He claims that *Wilson* applies here because, in both cases, confessions were obtained on an improper basis—by the use of fabricated evidence.

Next, Pena argues that the evidence is favorable because the State violated his right to due process when it obtained his conviction through the use of fabricated evidence and by not disclosing that his conviction was obtained using false evidence. *United States v. Agurs*, 427 U.S. 97 (1976). Alternatively, he concludes, the evidence is favorable to him because it constitutes valuable impeachment evidence that the State was

---

[3]We do not address Pena's Fourth Amendment claim because it is inadequately briefed. Pena's argument is limited to a single sentence citing a non-binding Fifth Circuit case stating that "[p]retrial use of fabricated evidence to secure a person's arrest *can* violate the Fourth Amendment." *Cole v. Carson*, 802 F.3d 752, 764 (5th Cir. 2015) (emphasis added).

required to disclose under *Brady*.

**Discussion**

*1. What Pena was Convicted of Possessing?*

The first question in this case is whether Pena was convicted of possessing the "real" drugs that were destined for Pena's car but stolen by Carrion or the substance he had in his possession when he was pulled over.[4] The second question is whether the substance seized from Pena is cocaine. The habeas court agreed with Pena that he was convicted of possessing the "real" cocaine that was never in his possession and that the substance seized from Pena's case was "an elaborate fake." We conclude, however, that the record does not support the court's findings or Pena's arguments.

Although Pena, in a sense, was carrying the "wrong" cocaine because of Carrion's drug-swapping actions; his conviction is based on the substance seized from his vehicle, not the cocaine he never possessed. And, as a matter of state law, the substance he possessed is cocaine. In Texas, a controlled substance includes the substance and any adulterants and dilutants. TEX. HEALTH & SAFETY CODE § 481.002(5). The term also

---

[4]Pena states in his brief that,

> [T]he arresting officer in [Pena]'s case conspired to steal the very evidence [Pena] was charged with possessing, replaced the evidence with a fake drug, interfered with an ongoing investigation in [Pena]'s case, and then used [Pena]'s arrest and conviction to cover up the conspiracy's crime from both the police and the narcotics traffickers.

Applicant's Brief on the Merits at 1.

includes the aggregate weight of any mixture containing a controlled substance. The Code makes no exceptions for cocaine with "a lot" of sheetrock in it or based on the purity of the controlled substance. Pena essentially concedes that the substance is cocaine when he states in his brief that "Carrion swapped the cocaine from Mexico for 'a mixture of gypsum sheetrock, other fillers, and a tiny amount of cocaine.'"[5] To be sure, Carrion's misconduct was willful, brazen, and appalling, but it does not change the fact that Pena was in possession of about 26 kilograms of cocaine (together with adulterants and dilutants) and that his conviction is based on that possession.

### 2. Texas Exclusionary Rule

Pena next argues that the evidence is favorable to him because Carrion tampered with or fabricated the drugs found in Pena's car before Pena took possession of them, and because Carrion violated Pena's personal rights when he did so, the drugs would have been suppressed under state law had a motion to suppress been filed. TEX. PENAL CODE § 37.09 (tampering with or fabricating physical evidence); TEX. CODE CRIM. PROC. art. 38.23 (statutory suppression rule); *Wilson*, 311 S.W.3d at 464. The habeas court did not adopt Pena's proposed conclusion of law that the drugs seized from Pena were subject to suppression, and we agree that the record does not support such a conclusion.

---

[5]In his dissenting opinion, Judge Walker claims that it would have been reasonable for Pena to argue that the sheetrock was not "added to" or "mixed" with the cocaine, but Pena himself refutes that argument, repeatedly referring to the drugs seized from his vehicle as a "mixture" and noting that the "mixture" was made by *adding* cocaine to a combination of sheetrock and other fillers. Dissenting Op. at 14–15 (Walker, J.) (emphasis removed).

To show that Carrion tampered with or fabricated the drugs seized from his car, Pena would have to show that Carrion knew that an investigation or official proceeding was pending or in progress and that he made, presented, or used the seized cocaine with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding. TEX. PENAL CODE § 37.09(a)(2); *Wilson*, 311 S.W.3d at 464. In addition, he would have to show that the misconduct in question took place before the commission of his crime because the state suppression rule "deals with exclusion of illegally obtained evidence of a *prior* crime[,]" not a crime committed after the misconduct. *Martinez v. State*, 91 S.W.3d 331, 340 (Tex. Crim. App. 2002) (emphasis in original). Interpreting the suppression statute to require the exclusion of evidence of a crime committed *after* the illegal conduct would lead to absurd results. For example, such an interpretation would "provide legal protection to the murderer of a police officer, who proves that the officer detained him without articulable suspicion prior to the murder. Under [that] theory, evidence of that killing would have to be suppressed under [A]rticle 38.23 because the murder occurred after and because of the officer's initial 'illegal' conduct.'" *Id.*

Here, there is no dispute that drug dealers returned Pena's car after placing an ice chest full of cocaine in the backseat, that Pena retook possession of the car and was the sole occupant of the vehicle when he was pulled over, or that Carrion's misconduct took place before Pena took possession of the cocaine in his car. Based on this, Pena cannot

prove that Carrion tampered with or fabricated the drugs in Pena's car within the meaning of Section 37.09 of the Texas Penal Code.

According to Pena, he is entitled to relief in light of our decision in *Wilson*. However, for the reasons we explain, that case is distinguishable. In *Wilson*, the appellant was walking home one day with his son when they discovered a body. *Id.* at 454. The victim, Amos Gutierrez, had been shot and killed. *Id.* Police began an investigation, during which they received information that Wilson was involved in Gutierrez's murder. *Id.* Wilson was subsequently arrested and confessed to shooting the victim. *Id.* During the interrogation, he initially denied any involvement in the murder, but he later confessed after the interrogating officer presented him with a forensic laboratory report indicating that his fingerprints were found at the murder scene. *Id.* The report was wholly fabricated by the interrogating officer. *Id.* at 454.

Wilson filed a motion to suppress, arguing that his confession was involuntary. At a hearing on the motion, the interrogating officer admitted that he violated the "tampering with or fabricating physical evidence" statute because he had created a false document that he presented to Wilson as genuine, and he intended for Wilson to rely upon it. *Id.*; TEX. PENAL CODE § 37.09 (a person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he makes, presents, or uses any document with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding). Wilson argued that, because the interrogating officer

violated Section 37.09 of the Penal Code, and the documentary evidence was used to obtain his confession, his confession was subject to suppression under the state exclusionary rule. TEX. CODE CRIM. PROC. art. 38.23 (stating that no evidence obtained in violation of the laws of the State of Texas shall be admitted into evidence against the accused). Once the issue reached this Court, we held that the confession should have been suppressed. *Wilson*, 311 S.W.3d at 465. In reaching that decision, we explained that fabricating evidence in an official investigation to obtain a confession is at the core of what the exclusionary rule forbids and that, because the interrogating officer fabricated a laboratory report with the intent that Wilson rely on it as genuine, and Wilson subsequently confessed to capital murder based on the false documentary evidence, his confession was inadmissible. *Id.* at 461.

In *Wilson*, the crime at issue was capital murder. As part of the investigation *following* the crime, the interrogating officer fabricated a forensic laboratory report and obtained a confession for capital murder based on that false evidence. The issue in Pena's case, however, is whether Carrion's actions *before* Pena took possession of the cocaine constitutes tampering or fabrication and renders the evidence inadmissible. As a result, *Wilson* is distinguishable.

### 3. Impeachment Evidence

Finally, Pena argues that the evidence of Carrion's misconduct is favorable to him because it is valuable impeachment evidence that the State was required to disclose.

According to him, he could have argued, had he filed a motion to suppress, that Carrion was not credible in light of his misconduct. We agree that Carrion's misconduct constitutes impeachment evidence. However, no matter how loathsome Carrion's conduct is, it is not exculpatory because it does not tend to show that Pena is not guilty of the crime. And, while we condemn the abuse of power by a public official such as the conspiracies Carrion orchestrated and participated in, jury nullification is not a valid legal argument.[6]

Pena further claims that, because the evidence of Carrion's misconduct is favorable impeachment evidence, the State was required to disclose it.[7] We disagree. The United States Supreme Court has squarely addressed the issue—"We must decide whether the Constitution requires that preguilty plea disclosure of impeachment

---

[6]Even if Pena knew about Carrion's conduct before he pled guilty and chose to file a motion to suppress—which is what Pena argues he would have done—he could not (successfully) argue that the drugs should be suppressed because of Carrion's misconduct. Instead, he would have to argue that, although he is in fact guilty of the crime, the factfinder should nonetheless suppress the drugs to "send a message" to police that Carrion's ilk will not be tolerated. The problems with this jury-nullification line of reasoning, however, are two-fold. First, it presents no legal reason for a judge to grant a motion to suppress. Second, Carrion's conduct was not endorsed by the police, and suppressing it would serve no policy purpose, but it would result in a guilty person going free. Given these circumstances, it would be difficult to argue that Pena would not have accepted a sentence of the statutory minimum when, had he gone to trial, he could have been sentenced up to 99 years' confinement. TEX. HEALTH & SAFETY CODE § 481.112(f).

[7]Today we address only whether impeachment information must be disclosed preguilty plea. We leave for another day the question of whether *exculpatory* information must be disclosed preguilty plea. *Ex parte Palmberg*, 491 S.W.3d 804, 814 n.18 (Tex. Crim. App. 2016) ("It is unclear whether or not *Brady v. Maryland* goes so far as to render guilty pleas involuntary if the prosecution does not disclose exculpatory information at the time of the plea, especially after the Supreme Court's holding in *United States v. Ruiz*.").

information. We conclude that it does not"—and we have adopted its holding. *United States v. Ruiz*, 536 U.S. 622 (2002); *Ex parte Palmberg*, 491 S.W.3d 804, 807–10 (Tex. Crim. App. 2016) (discussing the reasoning of *Ruiz* and apply its holding). As the Supreme Court noted in its decision, impeachment information is special in relation to a fair trial, not whether a plea is voluntary, and a defendant's plea is not involuntary merely because he does not have complete knowledge of every relevant circumstance of the case, including all information that could be used to impeach the State's witnesses. *Ruiz*, 536 U.S. at 629. As such, the State was not required to disclose information regarding Carrion's misconduct before Pena pled guilty.

## INVOLUNTARY PLEA

Finally, Pena argues that his plea was involuntary because he would have insisted on going to trial had the State not violated *Brady* by failing to disclose information about Carrion's misconduct. The habeas court agreed with Pena that he is entitled to relief. As we have explained, however, the State was under no duty to disclose impeachment evidence before Pena pled guilty, and as a result, he cannot show that his plea was involuntary on that basis.[8]

---

[8]Judge Richardson claims that we dispose of this case on a sufficiency basis in lieu of Pena's claim that his plea was involuntary. Dissenting Op. at 10 (Richardson, J.). That is not correct. Our discussion of the Health & Safety Code definition of "controlled substance" was only in the context of refuting Pena's argument that he was prosecuted for possessing drugs he never possessed and that his conviction is based on false evidence. It was necessary to address that contention before the remaining issues in the case could be resolved.

Judge Richardson also asserts that Carrion's misconduct was a "crucial fact" not known

## CONCLUSION

Having examined and rejected Pena's claims, we deny relief.

Delivered: November 15, 2017

Do Not Publish

---

by Pena at the time of his plea. *Id.* at 11. We agree that Carrion's misconduct was not known to the parties before Pena pled guilty and that a defendant's guilty plea must be made "with sufficient awareness of the relevant circumstances and likely consequence." *Ex parte Barnaby*, 475 S.W.3d 316, 322 (Tex. Crim. App. 2015). However, as we have already explained, the evidence of Carrion's misconduct constitutes *only* impeachment evidence, and the United States Supreme Court has made it crystal clear that impeachment evidence need not be disclosed to the defense preguilty plea. Therefore, under the current state of the law and for purposes of his involuntary-plea claim, Carrion's misconduct was not the type of circumstance to which Pena was entitled to be aware of before pleading guilty.